**HYSTRO PRODUCTS, INC.,**
Plaintiff–Appellee,

v.

**MNP CORPORATION, Defendant–Appellant.**

No. 92–3694.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 15, 1993.

Decided March 16, 1994.

William A. Denny (argued), Denny & Yanisch, Elm Grove, WI, for plaintiff-appellee.

Richard P. Carr (argued), Anne Morgan Hlavacka, David G. Hanson, Reinhart, Boerner, Vandeuren, Norris & Rieselbach, Milwaukee, WI, Steven Schubiner, Jacob & Weingarten, Troy, MI, for defendant-appellant.

Before CUDAHY, RIPPLE, and ROVNER, Circuit Judges.

CUDAHY, Circuit Judge.

American Hydraulics, a wholly-owned subsidiary of MNP Corporation, ceased operations without paying the final invoice for goods received from Hystro Products, Inc. Hystro sued MNP for payment of the bill, seeking to pierce the corporate veil of American Hydraulics. A jury found MNP liable on an alter-ego theory. Denying MNP's motion for a judgment as a matter of law, the district court entered judgment in favor of Hystro. We affirm.

## I. BACKGROUND

Hystro is a Wisconsin corporation that manufactures screw machine products. American Hydraulics, an Illinois corporation with a plant in Gurnee, Illinois, regularly placed orders with Hystro. MNP, a Michigan corporation, acquired all the stock of the financially troubled American Hydraulics for $100 in 1984. Between 1984 and 1987, Hystro's average monthly sales to American Hydraulics were approximately $15,000 to $20,000.

In June 1987, Hystro sold American Hydraulics $10,258.64 worth of goods. Hystro never received payment for what turned out to be its final shipment. For in August 1987, Hystro received notice that American Hydraulics was shutting down its operations. A letter from American Hydraulics stated that Heller Financial Corporation, American Hydraulics' senior secured lender, was owed $1,100,000, and there were no funds left to pay other creditors.

Hystro brought suit against MNP to collect on its bill.[1] MNP defended on the grounds that American Hydraulics was a separate entity, and that Hystro had waived its claim for payment by continuing to do business with American Hydraulics when it knew that company was in financial difficulty.

The jury returned a special verdict finding that MNP was the alter-ego of American Hydraulics and that Hystro had not waived its claims. MNP moved for judgment n.o.v. or for a new trial. The district court denied both motions, and entered judgment against MNP for $10,258.64, plus $2,988.53 in prejudgment interest. MNP appeals from the denial of its motion for j.n.o.v.

## II. CHOICE OF LAW

As a threshold issue, we must determine what state law governs this action. The district court concluded that no choice was necessary since there was no conflict of laws and applied Illinois law to the issue of corporate identity and Wisconsin law to the issue of waiver of contractual rights. Even in the absence of a "true conflict," however, we are still obliged to choose the applicable law. Hystro argues that either Michigan or Wisconsin law applies, and MNP argues that Illinois law governs.

We look to Wisconsin's choice of law rules to determine the applicable state law. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313

U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). In contract cases, Wisconsin courts apply the law of the state with which the contract has the most significant relationship. *See Diesel Service Co. v. Ambac Int'l Corp.*, 961 F.2d 635, 639–40 (7th Cir.1992). Relevant contacts include: the place of contracting; the place of negotiation of the contract; the place of performance; the location of the subject matter of the contract; and the respective domiciles, places of incorporation and places of business of the parties. *Id.* "The directive ... is not to count contacts but instead, to consider which contacts are most significant and to determine where those contacts are found." *Id.* at 640 (quoting *Haines v. Mid–Century Ins. Co.*, 47 Wis.2d 442, 177 N.W.2d 328 (1970)).

Michigan law is not applicable because, although MNP was incorporated in Michigan, neither the negotiations for nor the performance of the contract had any connection to Michigan. Hystro argues alternatively that Wisconsin law applies since the goods in question were manufactured there and American Hydraulics sometimes went to Wisconsin to pick up supplies. But the most significant contacts are with Illinois. American Hydraulics, whose activities are in question here, was incorporated and had its factory in Illinois. Even after MNP, a Michigan company, bought American Hydraulics, Hystro entered into contracts with the Illinois plant. We should therefore apply Illinois law on corporate identity and waiver.

The choice of law inquiry, however, does not stop there. Since this case arises as a review of a denial of a motion for j.n.o.v., we must still determine what test of sufficiency of the evidence to apply. In this circuit, it appears well-settled that, as between federal and state law, state law determines the standard governing a motion for j.n.o.v.[2] *Fort Howard Paper Co. v. Standard*

1. The case was filed in 1987, when the jurisdictional amount for diversity cases was only $10,000.

2. There is, however, conflicting authority both within this circuit and in other circuits. *See Gudgel v. Southern Shippers, Inc.*, 387 F.2d 723 (7th Cir.1967); 9 Charles Wright & Arthur Miller, *Federal Practice and Procedure*, § 2525, nn.

63 & 66 (1971). Usually, the federal and state standards are sufficiently similar that courts have not found it necessary to decide the issue. *See, e.g., Dick v. New York Life Ins. Co.*, 359 U.S. 437, 444–45, 79 S.Ct. 921, 926–27, 3 L.Ed.2d 935 (1959) ("Lurking in this case is the question whether it is proper to apply a state or federal test of sufficiency of the evidence to support a

*Havens, Inc.,* 901 F.2d 1373, 1382 (7th Cir. 1990); *Wieloch v. Rogers Cartage Co.,* 290 F.2d 235, 237 (7th Cir.1961). But this answer to the *Erie* question does not tell us *which* state law to apply. We must again look to Wisconsin's choice of law rules to tell whether Wisconsin courts would apply their own standard or a foreign standard for granting a j.n.o.v. Traditionally, we have identified an issue as substantive or procedural for this choice of law analysis: if procedural, the forum would apply its own law; if substantive, the forum would apply choice of law rules to determine the applicable law.[3] *See Nelson v. American Employers Ins. Co.,* 258 Wis. 252, 255, 45 N.W.2d 681 (1951); Restatement of Conflict of Laws §§ 584–585 (1934). The Second Restatement of Conflicts has abandoned the "substantive/procedural" dichotomy in favor of a rule generally favoring application of the forum law on issues concerning the conduct of litigation, and weighing numerous factors to determine other (frequently hard) cases.[4]

■ The Wisconsin courts give us little guidance, under their choice of law rules, in deciding this issue. Two factors lead us to the conclusion that Wisconsin would apply its own standard for sufficiency of the evidence. First, the Restatement (Second) § 135 states that the law of the forum will govern sufficiency of evidence questions. Moreover, the Wisconsin standard is not substantially different from the Illinois standard, and in such circumstances the forum would usually apply its own law. Thus, Wisconsin law provides:

> jury verdict where federal jurisdiction is rested on diversity of citizenship.... A decision as to which standard should be applied can well be left to another case where the question is briefed and argued."). Although we are perhaps not *required* to address the issue here, we think it appropriate to do so.

**3.** The question whether an issue is substantive or procedural for choice of law purposes should not be confused with the question whether it is substantive or procedural for *Erie* purposes. *Cf. Sun Oil Co. v. Wortman,* 486 U.S. 717, 726–27, 108 S.Ct. 2117, 2124, 100 L.Ed.2d 743 (1988).

**4.** The Restatement describes these factors:

> One factor is whether the issue is one to which the parties are likely to have given thought in the course of entering into the transaction. If

No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such a party.

Wis.Stat. § 805.14(1). In Illinois, a motion for j.n.o.v. may be granted "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *F.W. Hempel & Co. v. Metal World, Inc.,* 721 F.2d 610, 613 (7th Cir.1983) (quoting *Pedrick v. Peoria & Eastern R.R. Co.,* 37 Ill.2d 494, 229 N.E.2d 504, 513–14 (1967)). Thus, a Wisconsin court would apply the Wisconsin standard to a motion for a j.n.o.v., and Illinois law to the issues of piercing the corporate veil and waiver.

## III. PIERCING THE CORPORATE VEIL

■ In Illinois, a corporation's "veil" of limited liability may be pierced only if two requirements are met:

> First, there must be such unity of interest and ownership that the separate personalities of the corporation and the individual [or other corporation] no longer exist; and second, circumstances must be such that adherence to the fiction of separate corpo-

> they probably shaped their actions with reference to the local law of a certain state, this is a weighty reason for applying that law rather than the local law of the forum the plaintiff has chanced to select. Another factor is whether the issue is one whose resolution would be likely to affect the ultimate result in the case. If so, the otherwise applicable law should be applied unless application of the local law of the forum is required by the dominant interest of the forum state in the decision of the particular issue. A third factor is whether the precedents have tended consistently to classify the issue as "procedural" or "substantive" for choice of law purposes. If so, the settled classification should not be abandoned without reason.

Restatement (Second) of Conflict of Laws § 122 (comment a) (1971).

rate existence would sanction a fraud or promote injustice. *Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565, 569–70 (7th Cir.1985).

### A. Unity of interest

Stock control and the existence of common officers and directors are generally prerequisites to the piercing of the corporate veil although these factors alone will not suffice. *C M Corp. v. Oberer Dev. Co.*, 631 F.2d 536, 539 (7th Cir.1980). To determine whether there is sufficient "unity of interest and ownership" between two corporations, Illinois focuses on four factors: "(1) the failure to maintain adequate corporate records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another as its own." *Van Dorn*, 753 F.2d at 570.

Richard Kuzma, MNP's financial vice-president and American Hydraulics' vice-president and secretary, was largely responsible for running the American Hydraulics operation. His salary was paid by MNP. At trial, Kuzma testified about MNP's relationship to American Hydraulics. Following MNP's acquisition of the American Hydraulics stock in 1984, all of American Hydraulics' accounting and check-writing functions were moved from American Hydraulics' Gurnee location to MNP's headquarters in Utica. No person on the American Hydraulics payroll had authority to disburse funds to suppliers or to borrow money for American Hydraulics. MNP employees, who were not on the American Hydraulics payroll, wrote all American Hydraulics' checks; prepared American Hydraulics' monthly P & L statements and balance sheets; and submitted American Hydraulics' payroll information to a payroll service for processing. MNP mailed all American Hydraulics' checks from the Utica office, but did not charge American Hydraulics for postage.

Although American Hydraulics maintained its own operating account, Kuzma testified that the account basically kept a zero balance. None of the American Hydraulics receivables were deposited into this account. Instead, all receivables went to Walter Heller, which financed American Hydraulics through advances on receivables. When checks needed to be written on the American Hydraulics account, an MNP employee would telephone Heller and request that funds be transferred into the American Hydraulics account.

MNP also transferred funds totalling $1,300,000 from its operating account into the American Hydraulics checking account to cover expenses. These transfers were similarly made on the basis of telephone calls requesting money, and the only records were entries made by an MNP accountant in a log book. There were no promissory notes in evidence of advances nor was interest charged. Although MNP requested repayment of the loans, no check was ever cut for this purpose. Instead, Kuzma would occasionally transfer funds back to MNP if Heller had transferred excess funds into the American Hydraulics account. While the American Hydraulics balance sheet showed the $1,300,000 debt to MNP, the loans did not appear as accounts receivable on the MNP balance sheets. Rather, Kuzma testified, MNP's accountants did not expect American Hydraulics to repay the debt and recorded it as an uncollectible loss.

The jury heard other evidence that MNP and American Hydraulics did not observe corporate formalities. Neither Kuzma nor Timothy Hart, a manager at American Hydraulics, knew if there had been an annual stockholders' meeting of American Hydraulics after it was acquired by MNP. Afer acquisition, American Hydraulics prepared no separate financial statements.

The jury also heard the deposition testimony of Larry Berman, the president, chief executive officer, sole shareholder and sole director of MNP and president, treasurer and sole director of American Hydraulics. Hystro's counsel, Mr. Denny, trying to prove that MNP ran American Hydraulics as a department rather than as a subsidiary, asked Berman about MNP subsidiaries:

Q. About how many plants or facilities does it [MNP] have today?

MR. MURPHY: Does your question exclude subsidiaries?

MR. DENNY: 100 percent subsidiaries I guess they are a piece of MNP.

MR. MURPHY: Include in your answer subsidiary corporations so that it is clear on the record.

A: I don't think we have any subsidiaries.

■ This evidence was clearly sufficient for a jury to find that American Hydraulics did not maintain a corporate identity separate from MNP. In particular, MNP's close control of American Hydraulics' finances; the fact that MNP paid the salaries of American Hydraulics' officers; the informal transfers of cash between the organizations; and the absence of other corporate formalities all supported the jury's findings that American Hydraulics was the alter-ego of MNP.

### B. Promotion of injustice

To hold MNP liable as the alter-ego of American Hydraulics, Hystro was also required to prove that adherence to the fiction of separate identities would "sanction a fraud or promote injustice." *Van Dorn*, 753 F.2d at 565. The district court did not address this requirement in the opinion denying j.n.o.v. Nonetheless, we conclude that there was sufficient evidence to support the jury's verdict.

■ In *Sea–Land Services, Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir.1991), this court considered at length the additional requirement of *Van Dorn* that the corporate relationships would "sanction a fraud or promote injustice." Although the "promote injustice" test requires something less than an affirmative showing of fraud, it requires something more than the mere prospect of an unsatisfied judgment. *Id.* at 522–23. "[C]ourts that properly have pierced corporate veils to avoid 'promoting injustice' have found that, unless it did so, some 'wrong' beyond the creditor's inability to collect would result." *Id.* at 524. Instead, "some element of unfairness, something akin to fraud or deception, or the existence of a compelling public interest must be present in order to disregard the corporate fiction." *Pederson v. Paragon Pool Enterprises*, 214 Ill.App.3d 815, 822, 158 Ill.Dec. 371, 574 N.E.2d 165 (1st Dist.1991). Canvassing Illi-

nois law, the *Sea–Land* court found that Illinois had pierced corporate veils to avoid injustice when failure to do so would: unfairly enrich one of the parties, *B. Kreisman & Co. v. First Arlington Nat'l Bank*, 91 Ill. App.3d 847, 47 Ill.Dec. 757, 415 N.E.2d 1070 (1980); allow a parent corporation, that had created a subsidiary's liabilities and was the cause of the subsidiary's inability to meet them, to escape responsibility, *In re Conti-Commodity Servs., Inc. Sec. Litig.*, 733 F.Supp. 1555, 1565 (N.D.Ill.1990); allow former partners to ignore obligations, *Gromer, Wittenstrom & Meyer, P.C. v. Strom*, 140 Ill.App.3d 349, 95 Ill.Dec. 149, 489 N.E.2d 370 (1986); or uphold a corporate arrangement to keep assets in a liability-free corporation while placing liabilities on an asset-free corporation, *Van Dorn*, 753 F.2d at 569. *Sea–Land*, 941 F.2d at 524. Considering *Sea–Land* on remand, the court found that a corporate owner who used his several corporations to avoid responsibilities to creditors was unjustly enriched and that the corporate veil was properly pierced. *Sea–Land Svcs., Inc. v. Pepper Source*, 993 F.2d 1309, 1312 (7th Cir.1993).

At the time of the shutdown, American Hydraulics had about $304,000 in trade debt, including the $10,258.64 owed to Hystro. Hystro claimed that it would be an injustice to allow MNP to escape liability when it had decided to shut down the American Hydraulics plant and knew that American Hydraulics would not be able to pay trade creditors, yet continued to order goods. As proof of MNP's fraudulent intentions, Hystro relied heavily on the testimony of Larry Berman, president of MNP. Mr. Denny, counsel for Hystro, read the following portions of Berman's deposition into evidence at trial:

Q: When was it that you [Berman]—either you personally or your company reached the decision that operations of American Hydraulics should be shut down?

A: When?

Q: Yes, sir.

A: Sometime prior to me doing it. I don't remember the date or the year.

Q: Well, you didn't make that decision one day and shut it down the next, did you?

MR. DENNY: Then Mr. Murphy [Berman's counsel], "If you know."

A: I assume if you specifically make the decision today to shut it down tomorrow, no.

Q: Over how many months did you make plans to shut it down?

MR. DENNY: Mr. Murphy, "assumes a fact not in evidence that he made plans to shut it down."

A: I am not sure. It was months.

Richard Kuzma testified at trial that vendors were not told that American Hydraulics was in default on its loan to Heller or was over $1 million "in the red." Kuzma had also testified in his deposition that the August 1987 shutdown was not a "total surprise" to him since he knew Heller was considering calling in the debt owed it.[5] However, these latter parts of Kuzma's deposition testimony were not read into the record at trial. Thus Kuzma's testimony that vendors were not told of the financial difficulties, together with Berman's testimony, are the only pieces of direct evidence we find to support Hystro's claim that, in June 1987, when American Hydraulics ordered goods from Hystro, MNP knew it would close American Hydraulics.

Illinois law has recognized that a corporate veil may properly be pierced in this situation:

> If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts.

*Stap v. Chicago Aces Tennis Team Inc.,* 63 Ill.App.3d 23, 28–29, 20 Ill.Dec. 230, 379 N.E.2d 1298 (1st Dist.1978), *quoting* Ballantine on Corporations 302–03 (rev. ed. 1946). The district court in *In re ContiCommodity Servs.* also addressed this question of a corporate parent's liability. 733 F.Supp. at 1565. There, plaintiff sought to hold Continental Grain Company liable for the acts of its fully-owned subsidiary ContiCommodity Services. The evidence was similar in some respects to the evidence here:

> (1) Continental owns substantially all of Conti's stock; (2) Conti's chairman of the board was an executive vice president of Continental; (3) Conti borrowed only from Continental and Continental provided significant capital infusions; (4) Conti was undercapitalized for short periods during 1982 and 1984 and may presently have funds insufficient to satisfy any judgment that may be entered against it; (5) Continental closed Conti and Conti is presently a nonfunctioning shell with a $35,000,000 reserve; (6) Continental controlled decisions at Conti including reducing positions, shutting down CAH [an office], restricting certain trading practices, and approving capital expenditures over $100,000; (7) Continental and Conti had consolidated financial statements; (8) funds of the two corporations were commingled to a limited degree; (9) Continental guaranteed some of Conti's debts; (10) Continental was involved in the hiring and firing of some Conti employees; and (11) Continental was informed of internal matters at Conti.

733 F.Supp. at 1565. On these facts, the court denied Continental's motion for summary judgment, noting that "if Conti is found liable, it may be an injustice to permit Continental to order Conti closed down and left with funds insufficient to satisfy liabilities

---

5. American Hydraulics was in default on its loan to Walter Heller, and Kuzma testified that Heller could have seized American Hydraulics' assets "any time they wanted." Later in the deposition, counsel for Hystro asked:

Q: When was the decision made that American Hydraulics would stop doing business?
A: Sometime after we received notification from Heller that they were going to foreclose on the loan that was in default.

Q: At this moment, what's your best recollection as to when that occurred?
A: Sometime in the summer, obviously prior to October. Prior to July 31, sometime I guess prior to July 31. There was a letter that—
MR. MURPHY: If you don't know, say you don't know, don't guess.
A: I don't know.

and not have Continental be liable for injuries caused in part by a practice of Conti ordered or approved by Continental." *Id.; see also Sea–Land,* 941 F.2d at 525 (following *ContiCommodity* ). These cases, while not dispositive, involve analogous situations where Illinois permitted the corporate veil to be pierced.

Hystro was apparently unable to adduce evidence that MNP caused American Hydraulics to place orders with Hystro, knowing funds would not be available to pay for them. This would have been damning. But the jury did hear much other (albeit less dispositive) evidence and was entitled to give great weight especially to the testimony of Berman, the president of MNP. Of course, we must view the evidence, and all reasonable inferences from it, in the light most favorable to Hystro. A reasonable jury could have found that MNP allowed American Hydraulics to continue to place orders knowing that it would "stiff" Hystro on the final bill. We cannot disturb the jury's conclusion that MNP should not escape liability behind the corporate veil. No doubt MNP justified its conduct by reference to the more than a million dollars that it pumped into American Hydraulics, of which a substantial part was spent for the benefit of suppliers. This, of course, does not change the legal consequences of the various events and relationships under examination here.

Perhaps the jury verdict in this case was affected by the instructions agreed to by both parties. The jury was instructed that it could disregard the corporate entity if it found that the corporation was "a mere device or sham to accomplish some ulterior purpose," or "a mere instrumentality or agent of another corporation," or a device to "evade some statute or to accomplish some fraud or illegal purpose in violation of plaintiff's legal rights." This formulation is somewhat less precise than the *Sea–Land* test on which MNP now relies. However, MNP

never objected to the instruction and agreed at oral argument that the instruction was "consistent with the law." Having failed to object or seek different instructions, MNP now advocates a somewhat more demanding standard but cannot show that there was no credible evidence to support the jury verdict.[6]

## IV. WAIVER

MNP raised the affirmative defense that Hystro waived its claims because it sold goods to American Hydraulics when it should have known that American Hydraulics was in financial difficulty. Alfred Manne, Hystro's president, testified that for about 20 years, Hystro had supplied Tri–Form Corporation, American Hydraulics' predecessor. Tri–Form went through Chapter 11 bankruptcy reorganization in the early 1980s and emerged owing Hystro $20,000. Although Manne testified that there had been a court order requiring Tri–Form to pay, Hystro never collected the debt. Hystro conducted business with American Hydraulics from 1984 until the final invoice in 1987 and was always paid for its shipments. Although Hystro had at one point obtained a Dun & Bradstreet report on American Hydraulics, Hystro did not know that American Hydraulics had a negative net worth.

MNP argues that these facts established that Hystro had known about American Hydraulics weak financial condition but had failed to protect itself and thus has waived recovery of the $10,258.64 debt. The jury rendered a special verdict finding that Hystro had not waived its rights. In its order denying MNP's motion for j.n.o.v., the district court noted sufficient evidence to support this jury finding. We agree that the verdict is sustainable. There is sufficient evidence that Hystro neither waived, nor is estopped from asserting, its claim.

---

**6.** Although there is some indication that this would once have been the end of the line for MNP, *see Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 675 (7th Cir.1985), *cert. denied,* 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986), it seems clear that a party need not object to jury instructions to urge a

j.n.o.v. based on different standards. *Boyle v. United Technologies Corp.,* 487 U.S. 500, 513–14, 108 S.Ct. 2510, 2519, 101 L.Ed.2d 442 (1988); *see also St. Louis v. Praprotnik,* 485 U.S. 112, 120, 108 S.Ct. 915, 922, 99 L.Ed.2d 107 (1988) (plurality); Wright & Miller §§ 2537 & 2558.

Waiver is the intentional relinquishment of a known right either expressly or by conduct inconsistent with enforcement of the right. *J.H. Cohn & Co. v. American Appraisal Assocs., Inc.,* 628 F.2d 994, 1000 (7th Cir.1980). MNP argues that, since Hystro knew of American Hydraulics' poor financial condition but continued to do business with it, Hystro has relinquished its right to recover. However, there certainly was sufficient evidence that Hystro did not intentionally waive its right to be paid for goods shipped. The jury was entitled to conclude that Hystro did not know of American Hydraulics' financial straits. American Hydraulics had never before withheld payment on a shipment. Moreover, Hystro lost no time in bringing this lawsuit after discovering that American Hydraulics would not pay the $10,-258.64 for the June 1987 shipment.

MNP also claims that Hystro was estopped from asserting its claims. Estoppel "arises when a party's conduct misleads another into believing that a right will not be enforced and causes the other party to act to his detriment in reliance upon this belief." *J.H. Cohn & Co.,* 628 F.2d at 1000. But there is no evidence that Hystro's "conduct"—selling goods to a financially troubled company that nonetheless had always paid its bills—led MNP to believe that it would not be sued for unpaid bills. In addition, MNP introduced no evidence that it had detrimentally relied upon Hystro's "failure" to stop shipments to a hard-pressed customer.

MNP relies on two Wisconsin cases that invoked waiver and estoppel defenses to veil-piercing lawsuits, *Bostwick–Braun Co. v. Szews,* 645 F.Supp. 221 (W.D.Wis.1986) and *Consumers Co-op of Walworth County v. Olsen,* 142 Wis.2d 465, 419 N.W.2d 211 (1988). In *Bostwick,* a creditor was estopped from piercing the corporate veil to satisfy a judgment because it had continued to do business for six years with an undercapitalized corporation. 645 F.Supp. at 227. In *Consumers Co-op,* a purchasing corporation detrimentally relied upon the extension of credit to it over several months by a creditor. Hence, the creditor was estopped from piercing the corporate veil to collect. 142 Wis.2d at 475, 419 N.W.2d 211.

As MNP has argued and as this court has found, the substantive questions here are governed by the law of Illinois, not of Wisconsin. We have found no Illinois applications of waiver and estoppel similar to the Wisconsin cases cited. But, in any event, the facts of both of those cases are far different from the ones before us: MNP has presented no evidence of detrimental reliance; there has not been even arguably an "extension of credit" by Hystro; and, unlike the plaintiff in *Bostwick,* Hystro does not rely exclusively on undercapitalization as a ground to pierce the corporate veil, but alleges commingling of funds and the ignoring of corporate forms. 645 F.Supp. at 227. The jury, properly instructed on the law of waiver and estoppel, considered the evidence, and we will not disturb its finding.

The order of the district court is therefore AFFIRMED.