# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 06-3711, 06-3821 & 07-1071

LABORERS' PENSION FUND, LABORERS' WELFARE
FUND OF THE HEALTH AND WELFARE DEPARTMENT OF
THE CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY, and
JAMES S. JORGENSEN, Administrator of the Funds,

*Plaintiffs-Appellees\Cross-Appellants*,

*v.*

LAY-COM, INC., an Illinois Corporation, LORD & ESSEX,
INC., an Illinois Corporation, and JOHN J. POPP JR., as
Trustee of the IRREVOCABLE LAY TRUST DATED
DECEMBER 26, 1995,

*Defendants-Appellants*,
and

JOHN J. POPP, JR., individually,

*Defendant\Cross-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01-C-6855—**Milton I. Shadur**, *Judge*.

ARGUED MAY 8, 2009—DECIDED SEPTEMBER 2, 2009

Before CUDAHY, MANION and TINDER, *Circuit Judges*.

CUDAHY, *Circuit Judge.* The Laborers' Pension funds won a default judgment against M.A. King Construstion, Inc. and King & Larsen Construction, Inc., as well as against Mike King, a director and officer of both companies. Those defendants were judgment proof, so the funds added new defendants in an amended complaint. The district court found some of the new defendants, Lay-Com, Inc., Lord & Essex, Inc. and the Lay Trust—but not John Popp Jr., an individual—liable on a veil-piercing theory, and granted summary judgment to the funds and to Popp Jr. We affirm the decision to pierce M.A. King's veil to reach Lay-Com and Lord & Essex, and we affirm the dismissal of Popp Jr. from suit. The Lay Trust, however, played no role in the transactions that rendered Lay-Com and Lord & Essex liable, nor did it wield control over M.A. King. We therefore reverse with respect to the Lay Trust and dismiss it from the case.

I

The veil-piercing question before us arises from the close relationship among several construction companies located just outside Chicago. Those companies included King & Larsen, a unionized subcontractor that did excavation work and poured foundations and driveways for residential properties. Mike King was King & Larsen's sole shareholder and a director and officer. Lord & Essex is a residential housing contractor that regularly hired King & Larsen to work on its job sites. Lay-Com is a developer of commercial and residential real estate.

Lord & Essex and Lay-Com are owned by the Popp family. More precisely, Lord & Essex is owned by John Popp Jr. and was previously owned by the Lay Trust. Lay-Com is still owned by the Lay Trust, which otherwise exists for the benefit of the Popps. John Popp Sr. and his wife were the trust's primary beneficiaries; Popp Jr. and his sister are secondary beneficiaries and, since Popp Sr.'s death in the midst of this litigation, co-trustees. Popp Sr. was the president and a director of both Lay-Com and Lord & Essex. Popp Jr. remains a director and officer in both companies.

In 1995, King & Larsen entered a collective bargaining agreement that required it to make monthly benefits contributions and payments of union dues to the funds. Late in 2000, King & Larsen began missing payments.[1] The company was suffering financially, and Lord & Essex and Lay-Com began loaning it money and paying some of its bills.[2] Meanwhile, Popp Sr. and King began plans for a new company called M.A. King Construction that would take over King & Larsen's business. Popp Sr.'s companies were to provide new financing for M.A. King in exchange for a first-lien position on King & Larsen's assets.

---

[1] In February 2001, King & Larsen entered into an installment note with the funds, requiring it to pay $50,000 between March and August 2001, for contributions that had come due between November 2000 and January 2001. Mike King personally guaranteed the amounts due under this agreement.

[2] It is unclear exactly how much money was sunk into King & Larsen in late 2000 and early 2001. The evidence in the record supports, at least, payments from Lay-Com to King & Larsen and its creditors totaling roughly $150,000, plus a $347,000 loan from Lord & Essex to King & Larsen.

M.A. King was incorporated on March 19, 2001, with the Popps and King as directors. The directors elected King as president and treasurer, and King's wife Gail as vice president and secretary. The directors also resolved to issue 25,000 shares of stock to the GAK Irrevocable Living Trust in exchange for a promissory note from the trust for $25,000. Both sides agree, however, that the shares were never issued and the capital contribution was never made. This turns out to be critical. No other capital contributions were made to M.A. King. To be sure, M.A. King did receive other types of financing, but all of it was debt. On April 1, M.A. King received a $250,000 loan from Lay-Com, secured by M.A. King's assets and Mike King's personal guaranty.[3] Also on April 1, M.A. King's board (with Mike King abstaining) entered into an employment agreement with King, setting his salary and prohibiting him from spending more than $2,500 on behalf of M.A. King (other than for taxes and payroll) without Lay-Com's consent. King was authorized to enter into banking relationships, but prohibited from borrowing on the corporation's behalf without Lay-Com's written consent.

At the center of the plans of Popp Sr. and King for the creation of M.A. King is a series of transactions (visually represented by Chart 1) that circuitously transferred most of King & Larsen's assets to M.A. King. As described in detail

---

[3] The district court found that no evidence supported the existence of this loan. Yet the parties' joint stipulation of facts refers to (and the supporting exhibits contain) a note evidencing such a loan, together with King's personal guaranty and the accompanying security agreement on M.A. King's assets. This is sufficient to show that the loan was made.

below, those assets traveled first through Lord & Essex and Lay-Com. The defendants have cast these transactions as a service to Mike King, but Popp Sr. arranged the transfer of assets through his companies so that Lay-Com and Lord & Essex could obtain first-lien priority on them before they were transferred on to M.A. King. Mike King agreed to the transactions because Popp Sr. promised to release a junior mortgage on the house of King's mother, Doralee. The defendants thus clearly believed they stood to benefit from the deal.

Chart 1



Turning to the series of transactions at the heart of the case, the first occurred on April 24, when King & Larsen and

Lord & Essex executed an "Assignment of Collateral and Satisfaction of Debt." In this agreement, King & Larsen assigned all of its assets to Lord & Essex, including $1.2 million in receivables, $80,000 in work in progress, $61,000 worth of shop materials, and perhaps $593,000[4] worth of vehicles and heavy equipment. In exchange, Lord & Essex released King & Larsen from debts of about $423,000 and assumed $1.1 million in accounts payable and $326,000 in other notes owed by King & Larsen. As even the defendants concede, "[n]otably, [Lord & Essex] declined to assume King & Larsen's tax liabilities and King & Larsen's obligations to the funds." Those liabilities remained in King & Larsen's otherwise empty shell. King & Larsen dissolved on July 2, 2001.

The second set of transactions also took place on April 24. Lord & Essex borrowed from Lay-Com to pay off the outstanding debts it had acquired from King & Larsen, observing corporate formalities when it did so (the companies executed security agreements and promissory notes for the amounts borrowed). Lord & Essex and Lay-Com then executed their own assignment agree-

---

[4] The assignment to Lord & Essex does not indicate how much King & Larsen's vehicles and equipment were worth in April 2001. A liquidation appraisal performed for Lay-Com in June 2001, which included most of King & Larsen's vehicles plus several others, valued that equipment at approximately $1-to-1.1 million. The defendants compared the assets included in that appraisal with the schedule of vehicles and equipment attached to the assignment to Lord & Essex to produce the $593,000 figure, which the funds do not contradict.

ment, whereby Lord & Essex satisfied its nascent obligations to Lay-Com by transferring King & Larsen's assets on to Lay-Com. Again the companies observed corporate formalities. Both sides agree that Lord & Essex "was merely a conduit" between King & Larsen and Lay-Com, which had funded Lord & Essex's acquisition from King & Larsen in the first place.

On May 1, the final transaction occurred. Lay-Com and M.A. King entered a "Master Lease and Assignment Agreement," in which Lay-Com *leased* to M.A. King the vehicles and equipment formerly owned by King & Larsen (these are the assets the defendants valued at $593,000, *supra* n.4) and *assigned* to M.A. King all of King & Larsen's other assets and liabilities. The assignment included the $1.2 million in King & Larsen receivables, the $80,000 in work in progress and the $61,000 in shop materials, as well as the $1.1 million in accounts payable and the $326,000 in other notes. In exchange, M.A. King agreed to make monthly payments of $17,805.24 to Lay-Com starting June 1 and continuing through May 1, 2008. M.A. King also agreed to pay an "operations fee" of 50% of its profits every other month starting July 1, with 15% interest payable on unpaid balances. The Master Lease and Assignment Agreement also contained a third-party distribution restriction (also incorporated in Mike King's employment contract), prohibiting M.A. King from making any payments (except taxes and payroll) to third parties greater than $2,500 without Lay-Com's consent.

M.A. King never made any of the payments required under the Master Lease and Assignment Agreement, nor

did it make payments on the April 1 $250,000 loan from Lay-Com. Lay-Com nonetheless continued to loan M.A. King money. Between April and October 2001, Lay-Com made another $268,000 in payments to M.A. King and its creditors, all subject to Mike King's guaranty and the security agreement applicable to the April 1 loan. The Lay Trust also issued five checks to M.A. King between April and August 2001, totaling $277,000. There is no corresponding note or other documentation covering these Lay Trust payments to M.A. King in the record. (The Lay Trust also issued a check to King & Larsen in October 1999 for $40,000.) As further evidence of the various companies' interrelatedness, Lord & Essex made two payments in August for prior King & Larsen services—due to M.A. King under the Master Lease and Assignment Agreement—not to M.A. King but instead to the Lay Trust. Lay-Com also made at least one payment to M.A. King for work performed for Lord & Essex.

Throughout the summer of 2001, M.A. King operated in King & Larsen's stead, picking up its contracts and operating out of the same yard and office, using the same fax and telephone number, the same employees, the same equipment. That summer Mike King also began making payments to the funds for King & Larsen's past-due obligations. (Recall that he had personally guaranteed an installment note for unpaid contributions in February 2001. *See supra*, n.1.) But King made those payments, totaling about $100,000, from M.A. King's accounts, not from his personal account or from any account of the defunct King & Larsen. Moreover, King paid only a fraction of the

amount King & Larsen owed the funds at the time. In August, the funds sued King & Larsen, M.A. King and Mike King for the outstanding balance.

In September, Mike King entered a new collective bargaining agreement on M.A. King's behalf, incurring new obligations to the funds. The Popps viewed Mike King's payments to the funds and the new union contract as violations of the third-party distribution restriction in the Master Lease and Assignment Agreement. As a result, the Popps resigned from M.A. King's board, and Lay-Com filed its own suit against Mike King and M.A. King, which led to a default judgment that apparently remains unsatisfied. M.A. King continued working for Lord & Essex until December 2001. M.A. King was dissolved in early 2002. The funds' lawsuit resulted in two more default judgments, against King & Larsen, M.A. King and Mike King, and the funds amended their complaint to add the current defendants. (The funds also added Gail and Doralee King as defendants, but they were voluntarily dismissed after the district court ruled on the parties' summary judgment motions.) On cross-motions for summary judgment, the district court found Lay-Com, Lord & Essex and the Lay Trust liable on a veil-piercing theory for $2,487,723.62, the amount that the district court found that M.A. King and King & Larsen collectively owed the funds. The district court found that Popp Jr. was not individually liable and dismissed him from the suit. This appeal followed.

II

The only issue here is whether it was appropriate to pierce M.A. King's veil to reach each of the defendants.[5] Veil-piercing is an equitable remedy governed by state law, here the law of Illinois because that is where all of the corporations at issue were incorporated. We have jurisdiction by virtue of the funds' original claim for relief under ERISA, 29 U.S.C. §§ 1132(e)(1) and 1145. *See* 28 U.S.C. § 1331; 28 U.S.C. § 1291. Because this is an appeal from a grant of summary judgment, our review is *de novo*. *Sea-Land Servs., Inc. v. The Pepper Source*, 941 F.2d 519, 521 (7th Cir. 1991). And though the decision whether to disregard the corporate form to impose liability is fact-intensive, *see Freeland v. Enodis Corp.*, 540 F.3d 721, 739 (7th Cir. 2008), here the material facts are not in dispute, making resolution on summary judgment appropriate.

A corporation exists separately from its shareholders, officers, directors and related corporations, and those individuals and entities ordinarily are not subject to corporate liabilities. *See Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 775 (Ill. App. Ct. 2005). Indeed, one of the primary purposes of incorporation is to limit liability and thereby encourage investment. An exception exists when an "individual or entity uses a corporation merely as an instrumentality to conduct that person's or entity's business." *Id.* at 775–76. Then a court may pierce the corporate

---

[5] The defendants do not challenge the district court's finding that M.A. King was King & Larsen's successor, and therefore liable for King & Larsen's obligations to the funds.

veil, and the individual or entity may be charged for the underlying cause of action. *See id.* at 776; *Sea-Land*, 941 F.2d at 520; *Van Dorn Co. v. Future Chem. and Oil Corp.*, 753 F.2d 565, 569–70 (7th Cir. 1985). The point is to prevent those who disregard the corporate form from then relying on it to avoid liability for their wrongdoing.

The standard test for piercing the corporate veil is two-pronged. The plaintiff must demonstrate both that there is "'such unity of interest and ownership'" between the individual or entity and the corporation "'that the separate personalities of the corporation and the individual [or entity] no longer exist,'" and that "'adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice.'" *Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1388–89 (7th Cir. 1994) (quoting *Van Dorn*, 753 F.2d at 569–70).

Courts consider a laundry list of factors to determine whether there is a "unity of interest" between two corporations (or between a corporation and a controlling shareholder or other dominant personality), *e.g.*, *Fontana*, 840 N.E.2d at 778, but the focus is on whether the corporations have respected corporate formalities—respected their separateness from each other—or whether one was a sham acting at the whim of the other. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 379 (7th Cir. 2008).

Likewise, the rule for determining when respecting the corporate form would sanction fraud or promote injustice is not clearcut, *see Hystro*, 18 F.3d at 1390 (discussing *Sea-Land*, 941 F.2d 519, and *Van Dorn*, 753 F.2d 565),

but "'[i]f a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts,'" that is sufficient, because "'it is inequitable that shareholders set up such a flimsy organization to escape personal liability.'" *Hystro*, 18 F.3d at 1391 (quoting *Stap v. Chicago Aces Tennis Team, Inc.*, 379 N.E.2d 1298, 1302 (Ill. App. Ct. 1978), further quoting Ballantine on Corporations 302–03 (rev. ed. 1946)).

Taking the defendants here one at a time, we find that Lay-Com controlled M.A. King's purse strings, if not its operations, and that it did so at least in part to avoid M.A. King's (and King & Larsen's) pension benefit and union dues obligations, and therefore that it was appropriate to pierce M.A. King's veil in order to hold Lay-Com liable for those obligations. The Master Lease and Assignment Agreement explicitly restricted M.A. King from entering any material transactions with third parties without Lay-Com's consent. Likewise, Mike King's employment agreement prohibited him from entering into such transactions on behalf of the company without written consent from Lay-Com. The kind of control exerted by Lay-Com over M.A. King is what is meant when the cases talk about a "dominating personality," *Fontana*, 840 N.E.2d at 775, that directs another entity at its whim.

To be sure, M.A. King is not the clearest case of a "sham" corporation that one might conceive. Sham corporations can be mere figments, little more than corporate names held up like picket signs by an individual who is individually responsible for the putative corporation's actions. In

*Fontana*, for instance, TLD Builders, Inc. was just a cloak for Nicola DiCosola, the husband of the nominal sole shareholder. DiCosola testified that TLD had never had an employee and that he had never kept records of his dealings with subcontractors. 840 N.E.2d at 774. At the time of suit, DiCosola had poured all of TLD's profits into another company. *Id.* Any capital that had been contributed to TLD in the first place (which, at most, was $1,000) had come from the DiCosolas' personal bank accounts. *Id.* By contrast, when the funds here filed suit in August 2001, M.A. King was a functioning corporation, performing jobs for Lord & Essex. It had assets and employees and contracts.

But M.A. King never operated *separately and independently* from Lay-Com. The Popps were on M.A. King's board; the Master Lease and Assignment Agreement prevented M.A. King from entering material transactions without Lay-Com's consent; and no stock in M.A. King was ever issued. Likewise these companies did not engage in arm's-length relations. M.A. King never made its required payments on the April 1 $250,000 loan or under the Master Lease and Assignment Agreement, but Lay-Com continued to extend it credit anyway. In a very real sense, then, M.A. King was completely subject to Lay-Com's control and to no other. We agree with the district court that Lay-Com was M.A. King's *de facto* principal.

Aside from these indicia of corporate form and control, undercapitalization is the single most important factor in the veil-piercing analysis. *See* William P. Hackney & Tracey G. Benson, *Shareholder Liability for Inadequate*

*Capital*, 43 U. Pitt. L. Rev. 837, 854, 885–86 (1982). Assessing whether a corporation is adequately capitalized is delicate business. The legal test—whether the corporation has so little money that it cannot operate its business on its own, *see Judson Atkinson Candies*, 529 F.3d at 379; *Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 195 F.3d 953, 961 (7th Cir. 1999)—provides little in the way of specifics. What does it mean for a corporation to operate "on its own"? Very generally, it means that the corporation has adequate equity (usually in addition to debt), though how *much* equity depends on the facts of the case.[6] This makes sense—a software designer has different equity needs than a car manufacturer—and in the right case a fight about undercapitalization could easily preclude summary judgment. What is clear, though, is that there must be *some* equity. Shareholders are generally expected to invest *some* money, that is, if they want the benefit of limited liability. *See Fontana*, 840 N.E.2d at 779 ("[S]hareholders should in good faith put at the risk of the business *unencumbered* capital reasonably adequate for the corporation's prospective liabilities.") (citing *Fiumetto v. Garrett Enters., Inc.*, 749 N.E.2d 992, 1005–06 (Ill. App. Ct. 2001) (emphasis added)).

---

[6] *See, e.g.*, Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability and the Corporation*, 52 U. Chi. L. Rev. 89, 113 (1985) ("By 'adequately' capitalized we mean an amount of equity that is within the ordinary range for the business in question. Both the absolute level of equity investment and the debt-equity ratio will depend on the kind of business on which the firm is embarked.").

The defendants argue that it is impossible to tell from this record whether M.A. King had enough capital to meet its prospective liabilities, because nothing shows its day-to-day cash needs or obligations. Yet this argument confuses M.A. King's *working* capital (that portion of a firm's assets that are in relatively liquid form, such as cash, accounts receivable and inventory) with its *equity* capital (the excess of total assets over total liabilities—what is called "unencumbered capital" in *Fontana*). Undercapitalization is primarily concerned with unencumbered or equity capital, *see Lifschultz Fast Freight v. Salson Express Co., Inc.*, 132 F.3d 339, 351 (7th Cir. 1997), also called "paid-in" capital, describing the investment made by the shareholders at the establishment of a corporation, *Fentress v. Triple Mining, Inc.*, 635 N.E.2d 102, 108 (Ill. App. Ct. 1994). Again, this is because veil-piercing is an exception to limited liability, and, under the doctrine of limited liability, shareholders only risk the *equity capital* that they invest. *See* Frank H. Easterbrook & Daniel R. Fischel, *Limited Liability and the Corporation*, 52 U. Chi. L. Rev. 89, 89–90 (1985). If the shareholders do not invest enough equity, such that the corporation is undercapitalized, there is no basis for rewarding them by limiting their liability, and, in fact, doing so would only encourage risky behavior. *See id.* at 114. Whatever else might be said about how much equity capital is enough, here it is clear that M.A. King had *no* equity capital *at all*. It was unquestionably undercapitalized.

The GAK Trust never made its promised $25,000 contribution, and there was no other stockholder contribution. To the extent Lay-Com was an investor in M.A. King,

its investments were, at least nominally, loans meant to be repaid, not unencumbered contributions available to creditors of the corporation. Even adding the value of all of the King & Larsen assets that were assigned to M.A. King (about $1.3 million[7]) to all of the cash loans from Lay-Com ($518,000) and all of the undocumented payments from the Lay Trust ($277,000), M.A. King's total assets still amounted to less than $2.2 million. That is significantly less than M.A. King's total liabilities, which, conservatively, came to almost $2.8 million. Included in this calculation of M.A. King's liabilities are King & Larsen's accounts payable and the notes on which King & Larsen was still obligated ($1.5 million), taxes ($500,000), and pension and union obligations ($800,000).[8] Not included are any of the amounts owing to Lay-Com under the Master Lease and Assignment Agreement or under the April 1 loan. Indeed, the April 1 $250,000 *loan* is treated as an *asset*. Even treating M.A. King's loans from the

---

[7] This amount does not include any value that might be assigned to King & Larsen's vehicles and equipment, because those assets were leased, not assigned, to M.A. King under the Master Lease and Assignment Agreement. However, even adding an additional $593,000 (the value the defendants placed on King & Larsen's vehicles and equipment) to the asset side of M.A. King's balance sheet does not tip the scales—its overall liabilities still exceed its overall assets, if only barely.

[8] The taxes and union obligations are included here because it is undisputed that M.A. King is King & Larsen's successor and therefore liable for its debts.

defendants as investments,[9] the defendants *still* have not shown that M.A. King had enough money to operate on its own—it was not capitalized in an ordinary sense at all.

Indeed, M.A. King fits a "typical pattern" among under-capitalized corporations in which the controlling share-holder takes profits out of the corporation as a manage-ment fee. Hackney & Benson, 43 U. Pitt. L. Rev. at 886. M.A. King's controlling "shareholder" was Lay-Com, and M.A. King was so badly off from the start that it never made a single payment on Lay-Com's hefty operations fee, which was to be 50% of M.A. King's profits every two months. In the end, then, we could treat the fictional $25,000 capital contribution from the GAK Trust as real, and it would make no difference:

$$\$2.2 \text{ million} + \$25{,}000 < \$2.8 \text{ million.}$$

---

[9] Treating debt as an investment is not unheard of, but it is unfavored by courts because by doing so, the lenders *cum* investors (here, the defendants) "give up nothing by way of profits if the corporation succeeds, but have assured themselves the preferred status of creditors if it fails, thus shifting to the legitimate creditors of the corporation a part of the risk that in fairness should be borne by the proprietary interest." *In re Mader's Store for Men, Inc.*, 254 N.W.2d 171, 187 (Wis. 1977). This is a primary basis for equitable subordination of shareholder claims in bankruptcy. It is also another sign of undercapitalization. For the need for a shareholder loan at the outset of a new business signals that the initial equity was insufficient. Here that was clearly the case—again, there was no initial equity invested in M.A. King at all.

Further, M.A. King's *failure* to meet its debts—M.A. King failed to make payments to both the funds and to Lay-Com—was additional evidence that it *could not* pay its debts and was therefore undercapitalized.

The defendants argue that if M.A. King had operated the way it was *contractually obligated* to operate under the Master Lease and Assignment Agreement, i.e., if Mike King had refrained from making unauthorized payments to the funds and from taking on King & Larsen's pension and union obligations, then the company would have been able to meet its obligations—in other words, it would have been adequately capitalized. But again, the defendants have conceded that M.A. King was King & Larsen's successor and therefore liable for its union obligations. M.A. King was not permitted to abandon those obligations, either by entering into a contract not to pay them or otherwise.[10]

Undercapitalization is almost never the only factor in a decision to pierce the corporate veil. *See Browning-Ferris*, 195 F.3d at 961. Indeed, this case illustrates how undercapitalization tends to go hand in hand with the "control" factor discussed above. Lay-Com kept M.A. King undercapitalized as one mechanism of its control over the company. The defendants ignore the interaction between these two factors, and in doing so they make

---

[10] In any event, Lay-Com was entitled to, and did, obtain its own judgment against M.A. King for breach of that contract. But it cannot also use M.A. King's breach as a defense to a veil-piercing claim.

contradictory arguments. They argue that they had no control over M.A. King, as shown by Mike King's payments to the funds and his unilateral agreement with the union in September 2001. But they also argue that M.A. King was not undercapitalized because Mike King was not supposed to make such payments—the third-party distribution restriction was meant to keep him hemmed in. They cannot have it both ways.

All of this discussion risks ignoring the forest for the trees. M.A. King shut down less than a year after it set up shop, following a series of transactions that, admittedly, avoided King & Larsen's union obligations and attempted to keep Mike King on a short leash. Right off the bat, M.A. King needed a steady influx of cash loans from the defendants to keep going. These are all marks of an undercapitalized corporation, propped up by its parent or shareholders. The parties argue about whether the defendants reaped more value from M.A. King than they sowed, but this is beside the point. Also irrelevant is the defendants' contention that the funds would have been in the same or a worse position regardless of the defendants' actions because King & Larsen was failing before the defendants stepped in to create M.A. King and it would have been unable to pay the funds in any event.[11] What

---

[11] There is no authority for the defendants' position that a plaintiff's "windfall" defeats its veil-piercing claim (though we agree in principle that a windfall to the plaintiff could defeat the "promoting injustice" prong in the right case), but even if there were, the funds received no windfall here. Aside from the

(continued...)

is clear is that the failure to pierce M.A. King's veil to reach Lay-Com would "uphold a corporate arrangement to keep assets in a liability-free corporation while placing liabilities on an asset-free corporation." *Hystro*, 18 F.3d at 1390 (discussing *Sea-Land*, 941 F.2d at 524, further discussing *Van Dorn*, 753 F.2d at 569). M.A. King was the (relatively) liability-free corporation and King & Larsen was the asset-free corporation. The defendants arranged things this way. They cannot avoid liability by hiding behind such an arrangement.

Lord & Essex presents a more difficult case. It was not a party to the Master Lease and Assignment Agreement, and therefore it did not exert the same level of control over M.A. King as did Lay-Com. Moreover, there is no contention that Lay-Com and Lord & Essex were in fact a single entity, or that Lay-Com's veil should be pierced to reach Lord & Essex. Nevertheless, Lord & Essex was an integral part of the scheme of transactions that stripped King &

---

(...continued)
roughly $100,000 in payments they received from M.A. King (a fraction of what the funds were owed), the defendants' scheme of transactions prevented the funds from recovering *anything* from King & Larsen. If not for the scheme of transactions—and the first-lien position that the defendants obtained on M.A. King's assets—the funds might have been able to satisfy their entire judgment by collecting against King & Larsen. This is because, as the defendants have argued strenuously, King & Larsen's assets had value—on our rough calculation, about $2.2 million in value—far in excess of the roughly $800,000 King & Larsen originally owed to the funds and therefore sufficient to pay King and Larsen's initial debt.

Larsen of its assets and left it with nothing but its tax and union liabilities. Lord & Essex also extended credit to King & Larsen (the $347,000 loan) when King & Larsen was struggling financially, suggesting that Lord & Essex did not maintain an arm's length relationship with King & Larsen and, hence, with M.A. King. The district court also points out that twice Lord & Essex made payments to the Lay Trust that should have gone instead to M.A. King for King & Larsen's prior work, showing a lack of corporate formality. It is a closer case, but we agree that it was appropriate to pierce M.A. King's veil to reach Lord & Essex. If not for its role in the scheme of transactions, however, Lord & Essex would have escaped liability, for its disregard of corporate formalities was not enough, on its own, to warrant piercing the veil.

That leads us to the Lay Trust. Unlike the other two corporate defendants, the Lay Trust played no role in the scheme of transactions at issue. The district court relies on a "plus factor": that the Lay Trust made several undocumented payments to M.A. King in the summer of 2001. But this is not really a plus factor if it is not coupled with something else supporting the theory that the Lay Trust, too, controlled M.A. King, disregarded its corporate form, and kept it undercapitalized.[12] No other facts, other than the trust's association with the other

---

[12] The payments from the Lay Trust are themselves (more) evidence of M.A. King's undercapitalization because they too show that M.A. King lacked sufficient equity from the start to operate its business without such help. But courts will not pierce the corporate veil based on undercapitalization alone. *Browning-Ferris*, 195 F.3d at 961.

defendants—not in itself a sufficient basis for piercing the veil—are in this record. To be sure, the district court assigned only contingent liability to the Lay Trust (the trust was to be held liable only if the other two corporate defendants were unable to satisfy the judgment), but we find no basis for *any* liability. A court may not make up for a lack of evidence by assigning only contingent liability to an otherwise blameless defendant. The lack of evidence here means the Lay Trust must be dismissed from the suit.

Likewise, the district court correctly dismissed Popp Jr. from the suit, as he played no role in the events at issue other than in his capacity as an officer and director of Lord & Essex, Lay-Com and M.A. King. He did not use M.A. King for his personal benefit, or commingle personal funds with funds in M.A. King's accounts, or do anything else to suggest that he personally was a "dominant personality" deserving of individual liability. We therefore affirm the dismissal of Popp Jr. from suit.

One detail remains: the award of attorneys' fees to the funds. We review a district court's decision to award attorneys' fees for an abuse of discretion. *See Senese v. Chicago Area Int'l Bhd. of Teamsters Pension Fund*, 237 F.3d 819, 826 (7th Cir. 2001); 29 U.S.C. § 1132(g)(1). "There is a 'modest presumption' in favor of awarding fees to the prevailing party, but that presumption may be rebutted." *Senese*, 237 F.3d at 826 (quoting *Harris Trust & Sav. Bank v. Provident Life & Accident Ins. Co.*, 57 F.3d 608, 617 (7th Cir. 1995)). The defendants have not rebutted the presumption. Rather, they have argued that if we reversed, we should also reverse the fee award. We are

reversing in part, but the funds may still be found to be "prevailing parties," *see J.B. Esker & Sons, Inc. v. Cle-Pa's P'ship*, 757 N.E.2d 1271, 1276 (Ill. App. Ct. 2001) ("The fact that the court ruled in plaintiff's favor on some issues does not create a basis for a reduction in the award of attorney fees."). We find no abuse of discretion in the district court's fee award, nor do we find a requirement for reversing it in light of our modification of the merits.

## III

The decision of the district court is therefore

AFFIRMED in part and REVERSED in part.