In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 10-1203, 10-1227 & 10-1238

WACHOVIA SECURITIES, LLC,

*Plaintiff-Appellee*,

*v.*

BANCO PANAMERICANO, INC., et al,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 3082—**Virginia M. Kendall**, *Judge.*

ARGUED SEPTEMBER 22, 2010—DECIDED MARCH 21, 2012

Before MANION, TINDER, and HAMILTON, *Circuit Judges.*

TINDER, *Circuit Judge.* To recoup about $1.9 million in margin debt from a group of businessmen once dubbed "The 'Bad Boys' of Chicago Arbitrage,"[1] Wachovia Securities raised veil piercing and fraudulent transfer claims. That was shrewd because this is a particularly compelling

---

[1] *See* Greg Burns, *The 'Bad Boys' of Chicago Arbitrage*, BusinessWeek, Aug. 5, 1996, *available at* http://www.businessweek.com/1996/32/b34876.htm.

case for both given that the district court's generally undisputed findings—a convoluted web of entities, insider transactions, and sham loans all designed to avoid financial responsibility—soundly supported the claims.

## I. Factual Background

Appellants Leon Greenblatt, Andrew Jahelka, and Richard Nichols embrace a "three men and a telephone" business style. These purported business minimalists own Loop Corp. (also an appellant) as a closely-held corporation for their real estate holdings. Loop incorporated in South Dakota in 1997 with $1,000 in paid-in capital and maintains its principal place of business in Illinois. Greenblatt (Loop's corporate secretary) owns 50% of Loop. Jahelka (Loop's president) owns 30%. And Nichols (Loop's treasurer) owns 20%. Appellant Banco Panamericano, Inc. also incorporated in South Dakota and lists Illinois as its principal place of business. A Greenblatt family trust owns Banco. Greenblatt is Banco's sole officer, director, and employee.

A focus of this appeal is a $9.9 million line of credit Banco gave Loop on January 3, 2000. In exchange, Loop gave Banco a blanket lien over Loop's assets (once totaling an estimated $32 million) at a 12% interest rate. A promissory note and a security agreement documented this transaction. Greenblatt signed for Banco and Jahelka signed for Loop. On the same day, a handful of Loop subsidiaries entered into a participation agreement on the line of credit through which they (and other entities

associated with the Loop owners) advanced $3 million to Loop. This arrangement gave the subsidiaries senior secured creditor status over Loop's assets. Greenblatt signed for Banco and the participants and Jahelka signed for Loop. As Greenblatt admitted at trial, the now-creditor subsidiaries also functioned as collateral for the funds they loaned Loop.

Later that year, Greenblatt's clerk David Neuhauser, at his boss's direction, opened a Prudential Securities margin account in Loop's name. As Wachovia is Prudential's successor-in-interest, we will discuss this account as though it was always a Wachovia account. Loop used the account to buy shares in Health Risk Management, Inc. (HRMI) on margin. Yet on May 22, 2001, the NASDAQ halted trading in HRMI.[2] The value of Loop's HRMI stock plunged prompting Wachovia to issue a margin call on Loop's account. Wachovia liquidated Loop's account, but a $1,885,751 debt remained. The Banco-Loop line of credit also matured at the end of 2001 and Loop defaulted. Instead of enforcing the loan's terms or attempting to collect, in 2002 Banco extended and expanded the line of credit to Loop. Greenblatt testified that loaning Loop more money maximized "the

---

[2] According to the district court, Neuhauser purchased HRMI stock on the open market at Greenblatt's direction through a number of brokerage accounts. *Wachovia Secs., LLC v. Jahelka*, 586 F. Supp. 2d 972, 1004 (N.D. Ill. 2008). One of Neuhauser's jobs was assisting Greenblatt with an investment strategy involving HRMI. *Id.*

value of Loop's assets." Banco advanced Loop money into 2004. The district court placed the current loan balance at $16 or $17 million and about $1 million in interest.

Meanwhile, Loop's debt to Wachovia went unpaid. Greenblatt did not let Loop use the Banco loan to repay Wachovia, citing the loan's terms, but in reality, the terms were quite broad. Greenblatt testified that the loan's terms covered buying HRMI stock but later claimed that its purchase was a "cost" and that the margin debt was "financing." When given the note's language stating that the loan's purpose included "repayment of prior indebtedness . . . or other purpose approved by" Banco, Jahelka acknowledged that the terms did not require Banco's approval to use the funds to repay debt. Loop also invested $518,338 in Internet-based golf tee time reservation company EZ Links. In addition, Loop moved its real estate assets to Loop Properties, of which Loop owns 10% with the remainder held by Scattered Corp. (owned by the Loop owners). Loop gave $386,550 to Banco, $20,000 to Resource Technology Corp. (owned by Rumpelstiltskin, which in turn was owned by the Loop owners), $2,000 to Scattered, $20,000 to Telegraph Properties (a Loop subsidiary), and $15,775 to Loop Telecom LP (an entity related to Loop). Appellants claimed these payments reduced Loop's debt to Banco on a dollar-for-dollar basis, but the district court rejected this claim when appellants failed to produce admissible or reliable evidence to support the theory. Loop paid Nichols and Jahelka $210,500 in "compensation" but never issued W-2 forms or other-

wise reported the payments yet managed to issue W-2 forms to Loop's other employees. Loop originally dubbed payments to the Loop owners as a "return of equity," but without explanation or documentation started calling the payments "compensation" after the HRMI stock collapse.

Wachovia initiated arbitration (pursuant to the terms of the brokerage agreement) against Loop in 2003 and also named Neuhauser, Jahelka, Nichols, and Greenblatt (in addition to Loop) as individual respondents who, in turn, sued Wachovia in Illinois state court to enjoin the arbitration against them individually. Wachovia removed this suit to federal court on a diversity juris-dictional basis, answered the complaint, and filed counter-claims. Wachovia dropped the individual respondents from the arbitration proceeding and the district court realigned the parties with Wachovia as plaintiff and the Loop-related parties as defendants. In 2005, Wachovia obtained an arbitration award against Loop, which was reduced to a $2,478,418 judgment. The district court granted defendants summary judgment on some of Wachovia's claims, *Wachovia Secs., LLC v. Neuhauser*, 528 F. Supp. 2d 834 (N.D. Ill. 2007), and held a bench trial in January 2008 on the remainder of Wachovia's claims that resulted in the court piercing Loop's corporate veil and finding Greenblatt, Nichols, and Jahelka personally liable on the judgment. The court also voided as fraudulent transfers Banco's lien over Loop's assets, Loop's "compensation" payments to Jahelka and Nichols, and certain Loop payments to

EZ Links, and ordered appellants to pay Wachovia's fees and costs. *Wachovia*, 586 F. Supp. 2d at 1025-26.[3]

## II. Analysis

Because the district court held a bench trial, Fed. R. Civ. P. 52(a)(6) requires us to leave findings of fact untouched "unless clearly erroneous." We review legal conclusions de novo. *See Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1044 (7th Cir. 2002).

### A. Veil Piercing

In diversity cases, we look to the substantive law of the state in which the district court sits, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), including choice of law rules, *Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496-97 (1941). Illinois applies the law of the state of incorporation for veil piercing claims. *E.g., Retzler v. Pratt & Whitney Co.*, 723 N.E.2d 345, 354 (Ill. App. Ct. 1999); *see also Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 378 (7th Cir. 2008). Yet appellants did not address choice of law until appearing for trial after four years of litigating this case. By waiting all that time while asserting Illinois law in their briefs to the district court, appellants acquiesced to Illinois law. *See Lott v. Levitt*, 556 F.3d 564, 568 (7th Cir. 2009) (waiver

---

[3] We compliment the district court's thorough and exhaustive opinion in this matter.

prevents this "very type of gamesmanship" of seeking a "free peek at how" a dispute shakes out); *Muslin v. Frelinghuysen Livestock Managers, Inc.*, 777 F.2d 1230, 1231 n.1 (7th Cir. 1985) (waiting until "a late point in" the litigation waived objecting to choice of law); *Int'l Adm'rs, Inc. v. Life Ins. Co.*, 753 F.2d 1373, 1378 (7th Cir. 1985) (finding it "manifestly unfair and inappropriate, absent compelling reasons . . . to disapprove" of a court's choice of law when neither party objected); *Casio, Inc. v. S.M. & R. Co.*, 755 F.2d 528, 530-31 (7th Cir. 1985) (parties functionally stipulated to the law by not objecting); *Restatement (Second) of Conflicts of Law* § 136(2) cmt. h (when neither party refers to foreign law "in the pre-trial stages," the court "will usually decide the case" under local law). As the time to press the choice of law issue passed long before the start of trial, appellants waived objecting to the district court's application of Illinois law.[4]

Corporations exist separately from their owners. *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009) (citing *Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767, 775 (Ill. App. Ct. 2005)). The corporate veil allows an entity's investors to limit their liability and thus en-

---

[4] The district court also found South Dakota's veil-piercing law "substantially the same" as Illinois's law, and that where it diverged, it didn't change the result. We agree and given the evidence supporting the court's findings, we also do not see how the differences "change the outcome." *Int'l Adm'rs*, 753 F.2d at 1376 & n.4; *see also In re Air Crash Disaster*, 644 F.2d 594, 605 & n.2 (7th Cir. 1981) (a conflict must actually exist for choice of law to matter).

courage investment. *Id.* Yet courts may pierce a corporation's veil and hold the individual investors personally liable for the underlying claim if the corporate form "is used as a cloak or cover for fraud or illegality, to work an injustice, to defend crime, or to defeat an overriding public policy, or where necessary to achieve equity." 18 *Am. Jur. 2d Corporations* § 57 (footnotes omitted). Illinois law permits veil piercing when two separate prongs are met: (1) "there must be such unity of interest and ownership that the separate personalities of the corporation and the individual" no longer exist; and (2) "circumstances must be such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1388-89 (7th Cir. 1994) (quoting *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 569-70 (7th Cir. 1985)). For the first prong, Wachovia had to make a "substantial showing" that Loop was in fact "really a dummy or sham for" its owners. *Judson*, 529 F.3d at 380 (quoting *Rosier v. Cascade Mountain*, 855 N.E.2d 243, 251 (Ill. App. Ct. 2006)).

Appellants' appeal rests not on showing clear error in the district court's copious findings detailing appellants' extraordinary abuse of the corporate form but on an attempt to recharacterize various transactions and relationships with Loop's related entities as somehow legitimate. They portray the court's findings as a misrepresentation of their nontraditional, but admittedly relaxed corporate culture and structure, that functioned innocently and efficiently until the Wachovia margin debt arose. Appellants' attempt to rehabilitate the legiti-

macy of the business practices underlying the district court's veil piercing findings fails. The findings underlying the district court's decision to pierce Loop's corporate veil show an utter abuse of the corporate form. Their financial shell game leaves us quite satisfied with the district court's decision to apply the veil piercing remedy. The district court's findings regarding the complete unity of interest and ownership between Loop and its owners paint in stark detail a general disregard of Loop's separateness from its owners that opened a floodgate of fraud and injustice that blindly adhering to Loop's separate existence would sanction.

The district court structured its findings on the first prong around the factors Illinois courts consider to determine whether a unity of interest and ownership exists: inadequate capitalization; failing to issue stock; failing to observe corporate formalities; failing to pay dividends; corporate insolvency; nonfunctioning corporate officers; missing corporate records; commingling funds; diverting assets to an owner or other entity to creditor detriment; failing to maintain an arm's-length relationship among related entities; and whether the corporation is a mere façade for a dominant owner. *Fontana*, 840 N.E.2d at 778. No single factor is determinative. *See In re Estate of Wallen*, 633 N.E.2d 1350, 1357 (Ill. App. Ct. 1994).

Appellants argue that the district court clearly erred in finding Loop inadequately capitalized. No one disputes Loop's $1,000 paid-in capital but appellants argue the court ignored evidence showing an additional

$10 million Loop received at its inception. Adequacy of capitalization compares "the amount of capital to the amount of business to be conducted and obligations to be fulfilled." *Fiumetto v. Garrett Enters., Inc.*, 749 N.E.2d 992, 1005 (Ill. App. Ct. 2001). Without adequate capitalization, "a corporation becomes a mere liability shield, rather than an independent entity capable of carrying on its own business." *Id.* Adequate capitalization exists when a corporation has sufficient equity without considering loaned funds or encumbered assets. *Laborers' Pension Fund*, 580 F.3d at 612. "Shareholders are generally expected to invest *some* money . . . if they want the benefit of limited liability." *Id.* We needn't dwell on this factor because appellants ignore that the district court made an unfavorable evidentiary determination against them on this issue. Appellants staked their capitalization claim on a one-page summary document purportedly supporting a funding basis of $10 million. The district court deemed the documentary basis of that claim unreliable, lacking a foundation, and "another example of the Defendants' manipulation of records to support their trial position." *Wachovia*, 586 F. Supp. 2d at 992. Even if the document "had a modicum of evidentiary value as to Loop's actual initial capitalization, it fails to disclose the extent to which" Loop's assets "were pledged as security for another obligation." *Id.* at 993. Appellants do not contest any of these findings so we have nothing to review, although we note that forms signed by Greenblatt and Jahelka under penalties of perjury and filed with the Illinois Secretary of State from 1999 to 2002 put Loop's capitalization at $1,000.

So even if at certain times Loop had additional assets (and it apparently did given Loop's subsequent diversion of assets to related entities), the Banco line of credit encumbered them and Loop held itself out as thinly capitalized.

Regarding the related issue of Loop's insolvency, appellants claim that Loop was solvent before the HRMI stock collapse. Perhaps this is true, but it does nothing to refute the district court's finding that "Loop's assets were looted after it incurred its margin debt." *Id.* at 1002. The district court cited evidence that others paid Loop's legal fees and Loop's owners could not testify about its solvency. Loop's accountant testified that Loop relied on Banco for money and could not operate without the Banco line of credit. Loop's counsel also represented that Loop was a "dead company." *Id.* at 1002 & n.22, 1020. Loop may have maintained solvency until the HRMI stock it purchased on margin collapsed but that only marked the point at which Loop shareholders started raiding the company of its assets. Appellants point out that there was a lack of evidence that Loop shareholders looted corporate coffers "to indulge a fancy lifestyle complete with extravagant houses, fancy cars, and other such luxuries." Jahelka & Nichols Br. 49. Wachovia didn't have to prove that Loop's money was drained to support fancy lifestyles. The district court found that Loop paid nearly $1.2 million to insiders or related entities. The court also found that Loop's compensation to Jahelka and Nichols was abnormal and off the books. There was no error in the court's finding that Loop diverted its assets to its share-

holders and related entities after incurring its debt to Wachovia. *Id.* at 1006-07.

Appellants try to excuse the post-Wachovia debt plundering of Loop's assets as paying down the Banco loan. But the district court rejected the claim that Banco gave Loop dollar-for-dollar credit on the transfers. Appellants try to justify their failure to provide admissible and reliable evidence on the dollar-for-dollar credit theory on the basis that they went to trial thinking the issue was settled. Yet Greenblatt testified that a document supporting the dollar-for-dollar credit theory existed, not that the issue was settled. The district court, finding that appellants "magically" produced this document after trial, struck it under Fed. R. Civ. P. 37(b)(2)(A)(ii) (failure to comply with a court order) and 37(c)(1)(C) (failure to disclose). *Id.* at 988. The court went on to find that even if it considered the document, it was unreliable because Greenblatt prepared it based on unspecified Banco records, his notes, and "other financial documents." *Id.* The district court found the document "questionable based on Greenblatt's incentive to create a document to support his trial testimony" after Wachovia effectively attacked it. *Id.* Greenblatt's demeanor also supported the court's decision: "His flippant, condescending air in response to legitimate fact-finding questions further convince[d] the Court that he was intentionally evading the truth." *Id.* at 989. The district court also noted that Loop's one-time accountant contradicted Greenblatt's testimony and that Greenblatt was "an inherently incredible witness." *Id.* Appellants' unpreparedness at trial does not excuse attempting to support

Greenblatt's incredible testimony with a document they unquestionably failed to produce in discovery and which turned out to be "highly questionable." *Id.* at 988. The court's finding, that Greenblatt's "flippant, condescending air in response to legitimate fact-finding questions" suggested "he was intentionally evading the truth," is based on his credibility and demands "even greater deference . . . for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (citing Fed. R. Civ. P. 52(a)). Excuses about what the appellants thought was settled are insufficient to overcome these findings.

We move on to more uncontested findings appellants try to recharacterize. Appellants claim that Loop's lack of corporate minutes and accounting records; failure to file timely tax returns (and sometimes not at all), comply with Loop's bylaws, or require its attorney and accountant to record their time; and waiting until the end of the year to decide the accounting treatment for various transactions, among much else, didn't "overwhelmingly establish[] that Loop failed to observe corporate formalities." *Wachovia*, 586 F. Supp. 2d at 994. Appellants contest these findings' relevance. Yet the absence of formalities triggered the fraud or promotion of injustice we will discuss shortly. *See Sea-Land Servs., Inc. v. Pepper Source*, 993 F.2d 1309, 1313 (7th Cir. 1991). Loop's failure to conform to its bylaws enabled Greenblatt's domination of Loop's decision-making and Loop's failure to keep an arm's-length relationship with related entities. The

absence of proper corporate records related to the absence of documentation as to Loop's capitalization, the Banco-Loop loan, and the transfers to related entities. These findings paint a detailed picture of shareholders failing to respect the corporate form.

Appellants argue that the district court ignored the internal affairs doctrine. *See generally Citizens Elec. Corp. v. Bituminous Fire & Marine Ins. Co.*, 68 F.3d 1016, 1019 (7th Cir. 1995) (internal affairs doctrine is "a choice-of-law principle calling for resort to the law of the firm's place of incorporation"); 805 ILCS 5/13.05 (prohibiting Illinois from regulating foreign corporations' internal affairs); *Restatement (Second) of Conflict of Laws* § 307 cmt. a (1971) (shareholders expect to have the state of incorporation's law used to determine corporate liability). Even assuming South Dakota corporations may operate with this degree of looseness, this doctrine doesn't provide appellants with a defense because if Loop's owners actually relied on South Dakota law, we would expect them to raise choice of law earlier. And many of the laws upon which appellants rely were enacted in 2005, long after the actions in question occurred. *See* S.D. Codified Laws §§ 47-1A-732; 47-1A-732.5; 47-1A-1601. Appellants cite *Torco Oil Co. v. Innovative Thermal Corp.*, 763 F. Supp. 1445, 1451 (N.D. Ill. 1991) (Posner, J., sitting by designation), where it was noted that an owner of a "start-up" company naturally financed "the operations of the fledgling enterprise out of the assets of his other corporations without creating a meticulous paper record." Yet *Torco* found such informalities supported a finding on the first prong of the veil piercing test, noted that it couldn't pierce the

corporate veil on that alone, went on to consider evidence of "fraud or injustice," and found that "in spades." *Id.*

We will too in a moment, but there's more on the first prong. Jahelka and Nichols argue that they testified to their involvement in Loop and that they met regularly as shareholders. But nowhere do they show how they meaningfully used their 50% stake in Loop or where the district court went wrong finding that "Greenblatt's control over Loop's other officers and employees rendered them nonfunctioning." *Wachovia*, 586 F. Supp. 2d at 1003. They also do not explain how Greenblatt could have been anything but Loop's dominant shareholder because Greenblatt-controlled Banco financed Loop's operations. Jahelka and Nichols point out that the district court's finding that they "knowingly assisted [Greenblatt] in his efforts to improperly shield Loop from its creditors," *id.* at 1005 n.26, contradicts the court's finding that Jahelka and Nichols were nonfunctioning. The contradiction is superficial. The culpability shared by Jahelka and Nichols is immaterial in determining whether the shareholders had a unity of interest and ownership. The shareholders, by failing to act as they would in a truly independent corporation, enabled the fraud or injustice. On the other side of this issue, appellants fail to show where the district court clearly erred finding that Greenblatt functioned as Loop's dominant shareholder. Greenblatt refused to allow Loop to use proceeds from the Banco-Loop loan to pay Wachovia; at Greenblatt's direction, Loop's accountant falsely held himself out as Loop's vice president and Banco's assistant vice president; and

Greenblatt had Neuhauser trade HRMI stock on various brokerage accounts.

On the district court's arm's-length relationship findings, appellants point out that a secured insider loan "is not wrongful per se." *In re Lifschultz Fast Freight*, 132 F.3d 339, 345 (7th Cir. 1997). Of course it's not, but the district court supported its finding with much more. This was hardly a typical insider loan given Banco's sale of a $3 million participation interest to various Loop subsidiaries. Perhaps there were legitimate tax reasons for Loop's subsidiaries to loan Loop money through a related entity's line of credit while at the same time serving as collateral for the underlying loan, but this does not mean the district court clearly erred finding that this arrangement effectively "resulted in Loop contributing the funds (via its subsidiaries) that Banco would then turn around and lend back to Loop." *Wachovia*, 586 F. Supp. 2d at 986. The mere existence of a legitimate tax basis or another justification for the arrangement doesn't undercut the district court's finding that the Banco-Loop loan served as "a vehicle to avoid Loop's creditors by ensuring that all of Loop's assets were fully encumbered by a blanket lien in favor of Greenblatt, the dominant shareholder of both Banco and Loop." *Id.* The district court was quite justified in highlighting this transaction in determining whether Loop maintained an arm's-length relationship among related entities. Appellants also do not contest that Loop shared office space, equipment, and telephone and fax numbers with related entities. Loop moved employees between related entities, altered their titles, and had other related

entities provide them with health benefits. Loop also loaned about $2.2 million in 2001 to South Beach, which is owned by NOLA, LLC. NOLA's members are the fathers of Greenblatt, Nichols, and Jahelka. Greenblatt manages NOLA through another related entity, Teletech. South Beach loaned the $2.2 million to NOLA to buy HRMI stock. After HRMI collapsed, Loop sold the loan to Scattered (owned by the Loop owners) for $100,000 but Scattered never tried to collect.[5] Given this apparent shell game, the district court did not clearly err in finding that Loop failed to maintain an arm's-length relationship among related entities.

We are quite confident that the district court's findings supported the court's conclusion that Wachovia maintained a unity in interest and ownership between Loop and its owners so we move to the court's finding that adhering to their "separate identities would 'sanction a fraud or promote injustice.'" *Hystro Prods.*, 18 F.3d at 1390 (quoting *Van Dorn*, 753 F.2d at 565). This prong requires "something less than an affirmative showing of fraud," but "something more than the mere prospect of an unsatisfied judgment." *Id.* (quoting *Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 522-23 (7th Cir. 1991). Illinois law

---

[5] We discussed this transaction in *In re South Beach Securities, Inc.*, 606 F.3d 366, 378 (7th Cir. 2010), where we found Greenblatt "evasive and at times incredible" and that "his orchestration of a scheme aimed at a palpable misuse of bankruptcy, raise[d] serious ethical and perhaps legal concerns." We ordered Greenblatt to show cause why we should not sanction him. *Id.*

endorses veil piercing to avoid unfair enrichment, permitting the creator of a liability and cause of the inability to meet that liability to escape responsibility, and most apt to this case, allowing a corporation "to keep assets in a liability-free corporation while placing liabilities on an asset-free corporation." *Id.* (citing cases).

Adhering to Loop's separate corporate existence would allow Loop's shareholders to leave Wachovia holding the bag for Loop's failed HRMI investment. The Loop shareholders used their web of corporations to avoid their responsibilities to Wachovia by ensuring that Loop would not have sufficient funds to pay their debts. Adhering to Loop's corporate form would sanction an attempt by Loop's shareholders to set up "a flimsy organization to escape personal liability." *Laborers' Pension Fund*, 580 F.3d at 611. Appellants argue that Wachovia knowingly assumed the same risk as Loop that the value of the stock would decline. But Loop did not share any risk because Loop shuttled its assets elsewhere and a secured inside lender (Banco) encumbered whatever remained. As the district court found, Loop's shell status, the Banco-Loop line of credit, and its representations on the margin account created the false appearance of a company capable of covering potential losses on that account.

Appellants argue that Wachovia, as a voluntary creditor, must prove actual fraud, citing *Tower Investors, LLC v. 111 East Chestnut Consultants, Inc.*, 864 N.E.2d 927, 942 (Ill. App. Ct. 2007). But *Tower Investors* assumes "the parties possess a total understanding of all of the transac-

tions involved." *Id.* The party in *Tower Investors* seeking to pierce a corporation's veil knew of and uniquely benefited from the arrangement. *Id.* Here, Wachovia in no way benefited from Loop's arrangement with Banco and did not know that Loop's assets were encumbered by Banco, that Loop's source of funding was tightly controlled by one of its owners, and that Loop would drain itself of its assets when third-party debts arose. Loop created an appearance of a company capable of covering losses but meanwhile, the Banco loan (extended after Loop incurred the margin debt) encumbered its assets. By Greenblatt's own admission, Loop would generally not "pay lower classes of creditors." *Wachovia*, 586 F. Supp. 2d at 1012. Thus, the Banco loan preemptively and intentionally shielded any debt Loop incurred in the course of its business. If Loop's corporate shield was not pierced, its shareholders would be rewarded for using an insider loan to block payment of a debt while diverting money to themselves and related entities. Appellants fail to show clear error in the district court's finding that Loop's owners designed its corporate form and the Banco-Loop loan arrangement to enable Loop to do substantial business without sufficient capital to pay its debts. We affirm the district court's piercing of Loop's corporate veil.

## B. Fraudulent Transfers

In finding Banco's 2002 blanket lien over Loop's assets a fraudulent transfer, the district court found sufficient

evidence of both actual and constructive fraud under Illinois's Uniform Fraudulent Transfer Act (UFTA), 740 ILCS 160/5(a). *Wachovia*, 586 F. Supp. 2d at 1015-16. Yet because Wachovia disclaimed making a case on anything other than actual fraud we will only examine the actual fraud findings.

Banco argues that it held two blanket liens in Loop's assets, one established by the 2000 transaction and another by the 2002 agreement. Yet reading the 2002 transaction as anything other than an extension of the 2000 agreement with the same blanket lien would be a fundamental misconception of the arrangement. The 2002 agreement "consolidated, amended and restated" the 2000 "guaranty and security agreement" as described in the 2002 security agreement's caption. The 2002 agreement continued the lien created by the 2000 transaction and extended it to cover the new funds Banco loaned Loop under the same line of credit. In targeting the 2002 transaction as fraudulent, Wachovia claimed that Loop made the transfer "with the actual intent to defraud Wachovia and hinder or delay" its collection of Loop's margin debt. The 2002 transfer by its terms subsumed the obligations from the 2000 transaction. *Cf. Schwinder v. Austin Bank of Chi.*, 809 N.E.2d 180, 189 (Ill. App. Ct. 2004) (when a contract is modified or amended by a later agreement, a suit to enforce the agreement "must be brought on the modified agreement and not on the original"); *In re Cole*, No. 07-80542, 2007 WL 3302112, at *2 (Bankr. C.D. Ill. Nov. 6, 2007) (refinancing or an additional loan "involved a renewal of the prior note and a continuation of the security interest in the" collateral);

*In re Tardy*, 18 B.R. 36, 37 (Bankr. C.D. Ill. 1982); (if "a note is renewed on a debt, the security interest thereon is not changed unless there is some showing of intent to the contrary" or the parties "formed a new agreement"); *Cmty. Bank of E. Peoria v. Meister Bros., Inc.*, 299 N.E.2d 589, 592 (Ill. App. Ct. 1973) (five notes were intended "as a single, related transaction" and the "general rule is that where a note is given merely in renewal of another note and not in payment, the renewal does not extinguish the original debt nor change the debt except" to postpone repayment (internal quotation marks omitted)). Banco's 2002 transaction with Loop merely extended, under, as we shall see, quite suspicious circumstances, the same blanket lien over Loop's assets asserted in 2000.

A debtor makes a transfer or incurs an obligation that is fraudulent as to a creditor when done "with actual intent to hinder, delay, or defraud any creditor of the debtor." 740 ILCS 160/5(a)(1). Wachovia had to prove Loop's actual intent by clear and convincing evidence. *See Hofmann v. Hofmann*, 446 N.E.2d 499, 506 (Ill. 1983). To determine "actual intent," the district court considered the factors listed in 160/5(b), known as "badges of fraud," *Lindholm v. Holtz*, 581 N.E.2d 860, 863 (Ill. App. Ct. 1991), to see whether a sufficient number gave "rise to an inference or presumption of fraud," *Steel Co. v. Morgan Marshall Indus., Inc.*, 662 N.E.2d 595, 602 (Ill. App. Ct. 1996).

Appellants argue that the "badges of fraud" used by the district court to give rise to an inference of actual fraud were inapplicable or insufficient to raise the fraud

presumption. *See* 740 ILCS 160/5(b). The district court found that Wachovia proved five: (1) Loop incurred the obligation to Banco shortly before or after Loop incurred its substantial debt to Wachovia; (2) the loan was between insiders; (3) Loop retained possession or control of the property; (4) the transfer was of most of Loop's assets; and (5) Loop was insolvent or became insolvent shortly after the transfer. *Wachovia*, 586 F. Supp. 2d at 1015-16. Appellants argue that badge (3) does not apply because Loop did not retain possession or control of the property transferred in the 2002 transaction. Yet appellants also argue that "Loop always remained the title owner of all of its assets before and after the granting of either lien." Banco Br. 31. Either way, appellants say nothing of the district court's finding that Greenblatt's status as a 50% owner of Loop and sole owner of Banco gave him effective control over Loop's assets before and after the 2002 transfer. *Wachovia*, 586 F. Supp. 2d at 1016. Banco argues that badge (4) does not apply because Loop's assets were not transferred; as just noted, appellants argue that Loop remained the owner of the assets before and after the transaction. But a "transfer" under the UFTA includes the "creation of a lien or other encumbrance." 740 ILCS 160/2(l). By increasing and extending Loop's line of credit with Banco, the 2002 transaction allowed Banco to maintain and extend its lien on substantially all of Loop's assets. Given these badges of fraud, along with the attendant circumstances, the district court had more than an adequate basis to find an inference of Loop's fraudulent intent. *See Alan Drey Co. v. Generation, Inc.*, 317 N.E.2d 673, 679 (Ill. App.

Ct. 1974); *see also Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 419 F.3d 594, 600 (7th Cir. 2005) (badges of fraud, like symptoms of a disease, "are not additive"). Banco argues that the district court's ruling threatens to keep small business owners from lending to entities in which they own an interest. Yet the district court's findings show that this case rests on a rather extra-ordinary attempt to prevent creditors from collecting on a debt, a circumvention of the principle that when a business fails, shareholders are paid last. *E.g., Lasday v. Weiner*, 652 N.E.2d 1198, 1201 (Ill. App. Ct. 1995) (share-holders "are last in line" in a distribution from a dissolved corporation).

Regarding the other transactions found fraudulent, the district judge stated near the end of trial that she would not rule "on any fraudulent transfer that was not charged in" Wachovia's complaint. Thus, the court's finding that Loop's $518,338 payment to EZ Links was fraudulent was error as confirmed by Wachovia's coun-sel at argument. Wachovia also did not allege that Loop's payments to Jahelka and Nichols were fraudulent. Yet because appellants did not raise this issue in their opening briefs, they waived any argument on this rul-ing. *See Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (argument addressed in two sentences in opening brief deemed waived); *Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 675 (7th Cir. 2008) (raising argu-ment in reply "does not give an adversary adequate opportunity to respond").

### C.  Attorneys' Fees

We give a district court's fee decision great deference because of the court's familiarity with the case. *Spegon v. Catholic Bishop of Chi.*, 175 F.3d 544, 551 (7th Cir. 1999). In Illinois, a party who prevails on a veil-piercing claim may recover their fees if the underlying contract provides for a fee award. *See Fontana*, 840 N.E.2d at 783-84. Such is the case here and the district court found Loop and its owners liable for Wachovia's fees.

Appellants argue that the district court improperly shifted the burden to them to prove unreasonableness. Wachovia submitted a detailed fee petition and supported it with two affidavits and more than 190 pages of documentation. Once the petitioning party provides evidence of the proposed fees' reasonableness, the burden shifts to the other party to demonstrate the award's unreasonableness. *Cf. Spegon*, 175 F.3d at 554-55 (discussing hourly rates). Appellants have not countered Wachovia's adequate showing. Appellants argue that the fee order contravenes a district court order that they would only pay fees related to the veil piercing claim. Yet the district court also found that common facts formed the basis of similar legal theories. Behavior raising fraudulent conveyance claims prompts veil piercing claims, Robert Charles Clark, *Corporate Law* § 2.4 (1986), and this case is no exception. For example, one of the UFTA-challenged transactions was the Banco-Loop line of credit. This transaction was central to Wachovia's veil-piercing claim. Wachovia also reduced its petition by $140,000 to remove unrelated entries. Appellants' argument that

Wachovia unreasonably lumped time entries together is refuted by Wachovia's submission of 114 pages of billing records with each task accounted for and itemized.

### III. Conclusion

We AFFIRM the district court's order piercing Loop's corporate veil, voiding Banco's lien over Loop's assets and the compensation payments to Jahelka and Nichols, and granting Wachovia's attorneys' fees and costs but VACATE the voiding of Loop's payments to EZ Links.